We will hear argument in number 222048, Bell Semiconductor v. Advanced Semiconductor Engineering. Mr. Wright. Thank you, Your Honor. Can we begin with the set of questions that we asked you to be prepared to discuss about the status of Bell and Rome? Yes, absolutely. How that relates to whether we can decide anything here and the whole set of questions. Certainly. So we, Bell, initiated an investigation when the order issued on the 24th. Excuse me. We looked at the dockets that you had listed in the order regarding the Bell v. Microchip and Bell v. NXP district court cases that had been pending in the Western District of Texas. We checked our own correspondence with Rome at the time. Some of that correspondence was actually listed in a motion in the Bell v. NXP case. That particular, that was under seal. We obtained unsealed copies. I shared it with opposing counsel. We discussed it. In essence, and I have copies if the court wants to see those. In essence, there was an issue that was raised in the microchip case regarding joining Rome, who was the assigner of this patent. It was not challenged. It was an unopposed motion. Rome was joined because Judge Albright felt that there was, it was unopposed and that there was a potential interest there. Shortly after that, that case settled. So there was an order joining Rome, but there was nothing regarding ownership or anything along those lines that had changed that position. In the NXP case, there was the motion to continue without Rome as a non-indispensable party. During that, we submitted a number of exhibits, and those exhibits essentially were correspondences between former counsel for Bell and Rome, making them aware of the joinder issue in the district court microchip case. Rome got back to Bell and basically said, we don't believe we're subject to jurisdiction. We don't want to join voluntarily, and we're not waiving our Hague service rights. And that correspondence was in the microchip case, not the NXP case? It was in the microchip case. It was attached to the NXP case as part of the motion to continue without Rome in that case. And was that correspondence after the order in the microchip case joining Rome? Yes. The timeline was the joinder in the microchip case. That case settled. Then there was the NXP case, where it was the motion to continue without Rome because they weren't an indispensable party. And that's where the correspondence from the microchip case was introduced as sealed exhibits. And what about the question whether Rome is now or has been aware of this IPR proceeding? So we determined that Rome was not informed of the IPR at the time that the IPR was filed. The petition was filed in 2020. All the things that happened in the district court case had not happened. Bell believed that they were 100% owner of the patent, that it was a full assignment of all right, title, and interests. There was a license-back provision to Rome so that they could continue to operate a royalty-free license. There were encumbrances on the patent based on previous licenses that the patent license agreement requested that Bell accept as part of the deal, which they did. And then there is a whitelist provision in the patent assignment. And the whitelist provision, unlike the Lone Star case where there was a veto issue, these entities are already licensed. These entities are the whitelist entities that you agree are your targets. And there was no other listing of any companies that would perhaps be a target that Bell would go after and that Rome would have any type of a veto over. There was no control of the litigations. And then as a final point, we actually – Can I just add? Sure. In the – I think I'm remembering this right, but just correct me. That the assignment that's on file with the PTO is just the one-page assignment without any of the whitelists and other provisions that you mentioned. I guess I was inferring from the order in the microchip case that – microchip, is that what it was? Yes. Microchip case, that some of these other provisions, whitelist and so on, were what led the district court to order joinder of Rome. Why would that order carry over to require Rome to be part of the IPR proceeding as a patent holder? I believe the judge's order said that the joinder was being ordered partially because it was unopposed, but also because there was an interest. It didn't say an ownership interest, but it said they believed that there was an interest in the patent. And it did not really elaborate beyond that. I think the district court order invoked Rule 19A1B. Yes. Which said that the person claimed an interest. What was the basis for saying that Rome claimed an interest if later it said we're not interested? Yeah, I saw that as well, and I'm not sure where that term claim came from. We tried to get the actual unopposed motion. That was previous counsel. We did not have access to that. We contacted them, and we did not receive a copy of it. So I don't know exactly what that claim was. But Rome certainly never made any claim of having any interest in this patent, other than the license back, royalty-free license. I do want to, I guess, now ask you some questions about what your understanding is of the statute's regulations and rules. And don't worry about the time. Sure, absolutely. So what is your understanding? So my understanding is that Bell has always believed that they are the 100% owner of this patent, despite the joinder and the statement that Rome had an interest. Based on the correspondence with Rome, they certainly didn't seem to have an interest. And we've spoken to them, whether or not they were aware of the IPR. And their statement was they were not made aware of it by the petitioner at the time, 2020, at the time of the filing of the IPR. And they said that they may have been aware of it because they monitor U.S. litigation and IPR filings, but they may not have appreciated that it was a patent that they previously owned. So it sounds like, at a minimum, Rome is aware of it now. They are aware of it now. We believe that we made them aware of it anecdotally, not through a formal notice. But personnel from Bell Semiconductor had met with personnel from Rome not long after the final written decision came out prior to this appeal. And is your understanding of the law and rule such that if, indeed, Rome is aware of the proceeding now and is concerned that a patent in which it has what it might think is an ownership interest, that it could somehow or other seek to intervene in or otherwise make an effective legal filing with the board to say, don't take away our patent without us bringing it? After the fact, I'm not sure exactly what that situation is. There is an order out there saying join Rome because they may have an interest or they have an interest, but we don't see that interest and we don't understand why the court necessarily saw that interest because we don't see it. There doesn't seem to be any reservation of any exclusivity rights to Rome. And when Rome was notified of that joinder, they did not seem particularly interested in joining in the microchip case. They were also informed that there would be issues. One of the ways that I'm thinking about this is that nobody has raised this issue here. So there's a question, are we in some way obligated to do something about or attend to the possibility that Rome has an interest? If I now understand things, Rome is aware of the proceeding now, and it could seek to somehow become a participant in the proceeding if it had such an interest. And that maybe is some good reason that we don't have to pay attention to this issue. I understand your – I don't think there's been any interest on their part to get involved in this case. As I mentioned, they got back to us last night saying they may have been aware of the IPR, but they may not have appreciated it because it was a patent that they used to own. They certainly don't seem to believe that they have an ownership interest in it now. They didn't seem to be interested in being involved in the microchip case. I know that there are PTO decisions that say that you don't need to unwind cases in a situation, for example, where a petitioner's RPI was not listed until after the proceeding and they can be added as a potential interested party without unwinding all the procedures. And I don't know whether – I know that if ASE or we had informed Rome that perhaps they should consider whether they want to be part of the IPR and they went to the Patent Office, I'm not sure how that would be effective because Bell is still the 100 percent owner of that patent through the recordation. And I don't believe there's even a mechanism for the Patent Office to determine ownership during an IPR. There's a handful of board decisions that I've seen in which issues roughly in this ballpark have been discussed and it has mattered to some extent whether the missing potential owner has come in to say we have an interest. I think some of them say that the recordation is presumptively a proof of ownership, that it's only a presumption. And I'm trying to understand where this case fits in that. Half a dozen or so board proceedings and where the matter is not raised, it seems to me important. Potentially important. Certainly. That Rome is aware of the proceeding and if it had a concern, it might somehow express that concern. And it hasn't. It hasn't. It is aware of it. It is, at least as of 2022, this anecdotal discussion between personnel for Bell Semiconductor and personnel for Rome at a Chicago industry meeting. The final written decision from the PTAB had come out just a couple weeks before in June of 2022. They had this meeting and they mentioned that there was an IPR and it was likely going to be appealed. And there didn't seem to be any interest on the part of Rome. My understanding, I wasn't in the conversation, but as it was related to me, it wasn't as if Rome said, wait, how did this go on without us? And they've been told about this appeal and we asked them specifically when they became aware of it. They said they were not aware of it at the time of filing, but they may have become aware of it because they monitored things, but they may not have appreciated that it was a patent that they used to own. Not that it was a patent that, boy, I wish we had known about that. We would have jumped in there. It was we probably didn't appreciate it because we didn't own it. And it seems to me that they just don't have an interest in it. Certainly, they could be contacted to ask if they believe they have an interest in it, but everything that they've told us suggests, and based on our own review of the patent license agreement and Bell's belief that they have 100% ownership, it just doesn't seem that it's ever come up. Well, unless you have something to add, why don't you talk about what you plan to do? Sure. Thank you, Your Honor. Yeah, so our appeal is essentially, there are a number of things in the briefs that we discussed, but it's essentially a two-part argument that we believe the Board erred in its claim construction. Essentially, the biggest issue that we see is that the PTAB found a single-chip embodiment for the claimed method that we just do not believe is disclosed and we don't believe it was ever intended because the entirety of this patent is really directed to the efficiencies that are found in using a multi-chip method of manufacturing. And I want to just bring up just quickly what I'm talking about when I say single-chip and multi-chip because there is some confusion to the extent that final products that come out of the final cutting process. And just so I understand, do I understand right, putting aside the cutting issue, your first two issues really come down to whether the claim is broad enough to cover a single-chip embodiment. And when I say single-chip embodiment, I don't mean the final product. I mean the method of producing it. So is it a lead frame that holds one chip and then you put on a layer of passivation and then you cut it? Or is it a situation where you have a lead frame that is designed to hold multiple chips? Those multiple chips are put down. A resin layer is put across all of the chips in between them. And then that particular multi-chip lead frame intermediate product is then diced, cut into the individual semiconductor products that are the final product. Council, I would like to rephrase that. I don't see it as an either-or in terms of the options. It would be either it covers both a single-chip and multiple chips, or is it limited to multiple chips? We believe it's limited to multiple chips. I understand. You said it's an either-or, and I think it's more. I just wanted to make sure. I'm just stating it from the standpoint of distinguishing between, when I say a single-chip processing, I'm not talking about the final product. I'm talking about the process. I understand. One of the problems I have with your claim construction argument is the use of the word A, for example. Mounting a semiconductor chip on a lead frame, producing an intermediate product. There's nothing here that would, in the express language of the claim, that would make it so that the claim excludes a single-chip environment. Two points to that, Your Honor. One, the language about putting a chip on the lead frame, it's not a closed, only including these materials. It could be additional chips that are put on that. When you look at the term intermediate product, that's the hook that really brings the multi-chip into the claim. It was kind of overlooked by the Board because they were treating much of the disclosure, much of the intrinsic evidence on the multi-chip method, which is what we say the patent is, the entire thrust of this patent is to multi-chip processing. By taking out that intermediate product and treating it as a— So, Jeff, how is it that I should understand and the Board should have understood that an intermediate product must be more than one chip? So, it's specifically defined in the patent that the intermediate product that results from the molding process, and it's important to note that if you look through the patent, there really is one process that's mentioned in this patent. It's the creation of a multi-chip stamped lead frame, the attachment of multiple chips to that lead frame, the placement of a continuous layer over those chips, and the cutting of it. And the patent specifically says that the resultant molded intermediate product generally has the cross-sectional profile of figure 16. And so, that is the key difference between prior art and this invention. And it's not only in the patent, but Apelli admits it. If you look at Apelli's brief, Apelli's brief says that the claim language of Claim 1 tracks the prior art, and it points specifically to Column 1 of the patent. And in Column 1 of the patent, it says, very similar to the claim language, the semiconductor chip 92 is mounted on the frame, and then the bonding of the wire 93 is performed. The mounted chip 92 and the wire 93 are enclosed in the resin material. And then the next sentence says, finally, the thus obtained intermediate product of the prior art is diced into smaller pieces, one of which provides the semiconductor device shown in Figure 19A, which is the prior art device. So, we agree with Apelli that the language of our claim similarly uses this shortcut to discuss the multi-chip intermediate product, but from this perspective of the single chip, because that's ultimately going to be in the final product. It's a shorthand. And when the board looked at Column 2, the summary of the invention, it has very similar language. It talks about it from a single chip perspective. But this, again, this language is not designed to be limited. This is a summary that tells, from the perspective of the single chip, how it's going to be produced. But it still requires the process as laid out in the patent, the remainder of the detailed description of how that process is done. And that process is to create the specific intermediate product from a multi-chip lead frame shown in Figure 8. And Apelli also admits that, that the lead frame that goes into the molding process is the lead frame from Figure 8, which has multiple chips on it. And when you go into the molding process and you create the molded intermediate product, it tells you that that molded intermediate product has to be diced into individual semiconductor devices. That's at Column 6, Appendix 118, Column 6, Lines 43 through about 47. And so, even though there's a shorthand in the summary of the invention talking about it from the perspective of the single chip, as you read through this specification, you realize that the method includes making, and this is for purposes of trying to improve the efficiency of the overall process. Rather than focus on one chip on a lead frame, you can put multiple chips on a lead frame. They can be processed at the same time. You can place this layer, which is shown in Figure 16 as 5', which is a claim limitation. The layer is in the claim and it has a meaning. And there's a distinction in the patent between the layer that's placed during the intermediate product, 5', and the package material, the resin that's left on each individual chip after the dicing, after the separation of the individual products, has been made. And so there was some confusion at the board between there's not enough distinction between these two packages, the package material and the package layer. And we maintain that it's very clear that the package material is noted as 5' in the final products, but the packaging layer, which is part of the actual process of making the multi-chip intermediate product, that's continuous and shown as 5' in Figure 16. I just think it's a good place to bring up our second concern, is that part of the board's reasoning was based on Dr. Seuling, a petitioner's expert, who proffered a Figure 16'. And in Figure 16', that continuous layer, 5' from Figure 16, was excised. It was absolutely removed. It's hard to imagine a more contrary figure than taking Figure 16, which the patent says is the intermediate product cross-section, and removing one of the key elements, which is the claim limitation of the resin layer, the packaging layer. The board didn't rely on that modified figure, right? Well, I think the board did rely on it. First of all, where would the board get this idea that there was a secondary molding from Figure 16', which is part of the final written decision? But if you take a look, and I pointed out... When it came up, the board was relying on a statement in the summary of the invention. Well, they say specifically, and I can point out where this is, that... So if you look at... If you take a look at... It's probably best to look at the reply brief, our reply brief at pages 24 through 25. Actually, I thought you were going to tell us where... Something about the board decision. Yes, the board relied on... At appendix 23, you will see that the final written decision discusses petitioner's IPR reply at page 8. And that's appendix page 0435. Page 8 of the reply. That's right. And then page 8 of the reply relies on Dr. Sewing's declaration at paragraphs 18 through 20. And paragraph 20 is where Figure 16' is actually found. And that's found at appendix 1845 through 47. And I just note, you know, Apelli said that the board did not rely on Figure 16, but at page 15 of Apelli's brief, they tout the fact that the board relied on ASC's argument about the multi-chip embodiment that does not have resin between chips, which is Figure 16' from Dr. Sewing. So they did rely on it. It doesn't appear in the final written decision as Figure 16', but the fact that the board relied on paragraphs 18 through 20 of Dr. Sewing's declaration is indicative that they did rely on it. And as I said, we certainly didn't proffer this construction. This was something that Apelli and Dr. Sewing provided. And it's contrary to what actual Figure 16 says, which is regardless of the molding method you use, whether it's a single cavity mold, a multi-cavity mold, you conduct this resin molding operation on the multi-chip Figure 8 lead frame, and the resultant product is what you see in Figure 16. Let's look at the statement at the top of Column 3 in the summary of the invention, where it says preferably the packaging layer may be formed in a manner such that a chubbier discounts portion entirely, but allows part of the lead frame to be exposed. I see that part, Your Honor. And our first response is that it's really referring to the bottom of the lead frame, which is the portion of the electrodes that will actually be surface-mounted. Once the final products are diced. How do we know it's referring exclusively to the bottom surface of the lead frame when it says allow part of the lead frame to be exposed? They explain it in the detailed description at Column 4. If you look at Column 4, starting at about line 54, you'll see that there's a discussion there about how the exposed portion is the bottom that allows the final semiconductor products to be surface-mounted on a printed circuit board or some other circuitry after it's finalized. So it's necessary for the bottom surface to be exposed, right? To make electrical connection, that's correct. So then why would the top of Column 3 say preferably? Well, I think that that's… It would say necessarily, right? What it's really looking for is whether or not there are two stamped portions and whether or not those stamped portions… It seems like in a preferred environment we're going to have part of the lead frame be exposed. But really for this semiconductor device to function, it's not just in a preferred environment, it's in every environment. You have to have the bottom surface of the lead frame exposed. I would agree with that, John. So I guess my point is that the usage of the term preferably really seems to be not talking about the bottom surface. I agree with you that it does seem to have that implication, but I don't believe that there was any desire, based on anything else in this patent, to not have a continuous resin layer over all the chips in the multi-chip intermediate product. What are we to make of Figure 14 and all of these figures that show exposure of the lead frame on the ends of these various… Again, Your Honor, I believe that's focusing on the final product, and it's very difficult to make determinations about the method of production just from the final product alone because there could be additional… So the final product alone, you what? You somehow have etched away some of the resin layer on the ends? It's actually part of the cutting operation. If you look at the cutting operation and the explanation of how that happens, what essentially happens is there's a wider cut that comes down and cuts through the resin layer, and then the thinner portion comes down and cuts through the remainder and the lead frame, and what you get is this cut that looks like an etching, but it's not an etching. It's a mechanical cutting. Does the patent somewhere explain that? Yes, it does. The cut somehow creates the appearance of an etch? Yes, it does. I'll see if I can find that. So if you look, I believe, at Figure 17B, you'll see that the cut is being made, and you'll see that there is a cut in the lead frame, and that's the second cut. There's already been a cut through the resin material, and so you're using the wider diamond cutter to what I think you call an etching. I don't believe it's an etching. I believe it's a cutting to give you that step in Figure 14's lead frame, and I believe that 17B is actually discussed with respect to that. The Figure 15 is the final product that results from cutting Figure 16's intermediate product using the cutting of Figure 17B, and if you take a look at its column 7 lines, it looks like about 48. It says, as illustrated, the protrusions 13, this is the protrusions on Figure 15, the protrusions 13 are exposed at the bottom surface 50 of the resin package 5 for electrical connection, the current circuit board, see outer projections 15A, see Figure 17B, for example, expose the first surface of the package 5. So, again, it's a final product, and if you look at the final product to a certain extent, you can determine some of the processing that goes on it. In this case, you can't always determine whether or not that's what the final product is going to look like. There can be some additional processing that can be done after the dicing step, but the dicing step and really the intermediate product of Figure 16 is really what separates this invention from prior art. If you go back to column 1, it talks about a prior art system. In that prior art system, they again talk about it from putting on a single chip, but here they don't talk about a resin layer. They say there's a resin material, but they don't say there's a resin layer. If you look at the claimed invention, the difference is you're applying a resin layer across all the chips in between them, and part of that is for purposes of efficiency. You can produce. You have all of your time. Sorry, Your Honor. That's okay. I will restore your rebuttal. Very good. Thank you, Your Honor. Do you have anything to contribute on the question of ownership? Thank you, Your Honor. Yes, may it please the Court. Stephen Rizzi for Appellee Advanced Semiconductor Engineering. Just to be clear, my client was not involved in any of the district court proceedings where the patent was asserted, so we're a little bit in the dark, but Mr. Wright did agree to share some of the relevant documentation, including the full form of the assignment agreement and some of the correspondence. And based on that, I'm in full agreement with Mr. Wright that I don't see any real concern as to any jurisdictional or other impediment, either with regard to proceeding before the Board without Rome or at this court. So I certainly haven't had any direct correspondence with Rome myself, nor has my client. I did confirm, though, that Rome was provided with at least constructive notice of the IPR through the filing in the Official Gazette, which did take place in January 5, 2021, Volume 1482, Number 1. So that does provide constructive notice. And although there is no provision in the rules for constructive notice of an IPR per se, there is a provision for constructive notice of ex parte re-exams, which is MPEP 2230, and that explicitly provides that in instances where it's not possible to deliver to the patent owner notice for whatever reason, publishing in the Official Gazette is considered constructive notice. So I offer that because it reflects the PTO's longstanding view that, while it is, of course, preferable for all interested parties to be part of an IPR, the PTO has always taken the position that it may proceed even without the patent owner, certainly in an ex parte exam. Has the Board said that in an IPR? So yes, and these may be some of the decisions you alluded to. Well, I guess I'm thinking of one that I saw from 2018, FedEx against somebody, where once the Board concluded that there was no patent owner in front of it, it dismissed the petition, which I don't think would make you happy. No, I'm not aware of that case. So just to take a step back, and I will address a couple of the IPR, the PTAB decisions we found, and this Court, of course, has never directly addressed the issue, any kind of issue concerning necessary or required parties in the PTAB from a patent owner perspective. Of course, it comes up a lot from a petitioner perspective. But I will submit that there are some relevant decisions from the Supreme Court and this Court that do bear on the issue, starting with the oil states case, which recognized that a patent is a public franchise, and the nature of an IPR is an administrative agency reconsidering its decision to grant that public franchise in the first instance, so clearly implicating the public interest in IPR as opposed to… Would I be right in assuming that we do not have a Supreme Court or other case that says a property right can be taken away by the agency without giving notice to the owner of the property? I do not have a case that stands for that. That's the issue. Yes, yes. And I guess then the question is, what is notice? Is constructive notice sufficient? Is actual notice required? But again, your question does presume that there was a property right there. Everything we've seen indicates that there was no property right remaining in which Rome had an interest beyond retention of non-exclusive rights in the patent, which, of course, don't rise to the level of the ability to assert the patent. And I will say also that the fact that they explicitly opted not to participate in the Bell Semiconductor, I'm sorry, in the microchip case, where, of course, validity among other issues was also before the court, does certainly indicate strongly that there was no reason for them to reach a different decision for purposes of the IPR. Everything I've seen certainly confirms that they never believed they had any remaining interest that rose to the level of something that would require them to be a party even to a district court litigation under a Rule 19b analysis or certainly in an IPR, where I would submit the standard is lower because of the public interest, the significance of the public interest in an IPR and the fact that the rights that are impacted are more limited as opposed to in a district court case where there is no Article 3, there is no Section 281 that governs who has the right to actually enforce the patent in the IPR. It's just a question of revisiting the original grant. And to your point, Judge Toronto, was there an issue because sufficient notice wasn't provided to all potential stakeholders? And just to repeat something I think I at least have heard it before, it is clear, I take it, from what I think Mr. Wright said, that Rome knows about this now and if it wished to, it could do something to say a patent that I'm a part owner of is about to be declared right for cancelling and I want to be part of that to try to prevent it. Well, I have had no direct contact with them, but I certainly have no reason to question what we heard from Mr. Wright, that they have been explicitly put on actual notice of the status of both the IPR and the current appeal. So, on the merits here, the Board properly construed the language of Claim 1 to the extent necessary to determine that the Matsuo prior art reference teaches each of the steps of the claim method, which is defining a fact that a patent owner does not dispute based on the plain meaning of the claim language. Matsuo is really spot on with respect to Claim 1. It not only discloses the same... Do you have a view on the claim construction disputes raised on appeal? I'm sorry? Do you have a view on the claim construction disputes? Oh, absolutely. You were talking about substantial evidence, I think. Yes, yes. So, certainly on claim construction, there really is no reason to deviate from the plain meaning of the language of the claim. This is a clear, well-drafted claim that was intentionally drafted to not be limited to processing of intermediate products that had multiple chips, because there was simply no reason to. It has no bearing on what the novelty of the claim method is. The method is solely about making two cuts in the lead frame to separate the product from the lead frame. So, whether there's one or more products within that intermediate product has no bearing whatsoever on the utility or the application of the claim method. There's also no dispute that whether or not there's one product, one chip in the intermediate product or more, in order to create a final product or more than one final product, if there's multiple, those cuts have to be made, because the nature of a lead frame semiconductor product is that the lead frame itself acts as the support structure during the assembly process. So, it's not until you actually make those cuts that you actually create the leads, because they're all connected together, they're all shorted as part of the metallic lead frame. So, again, whether you're making one product or more than one product, there has to be a step of cutting the lead frame to remove that one or more product from the lead frame. The notion that clear, unambiguous claim language of a semiconductor chip should be construed to exclude a single chip I would submit is unprecedented and not supported by anything in the intrinsic record that even comes close to a disclaimer or lexicography. I think their argument is that the term intermediate product should be understood to be more than one chip. How do you respond to that? The claim language is tracked in the summary of the invention, which consistently describes... So, intermediate product, it's not a term of art. It's essentially, I would submit, it's defined in the claim itself to include only what's specified in the claim, which is a chip, the lead frame, and the molding compound, or the packaging layer. So, the claim itself clearly specifies what is meant by an intermediate product. That language is mirrored in the summary of the invention, which characterizes pretty much the same description in the claim of those steps as the present invention. Again, with deliberately excluding any requirement for there to be multiple chips in the intermediate product. The fact that the specific examples in the patent include multiple chips doesn't rise to the level of reading that limitation into the claim. For the reasons I mentioned. I would also submit that there really, even with the court to conclude that intermediate product required multiple chips, there's no serious dispute that the Matsuura reference discloses an intermediate product with multiple chips. I remember it correctly, but there's also no finding to that. That is true. The board did not make the finding. We certainly raised it. It was not refuted in their briefing on appeal. They really don't even address it. But we don't think that the absence of a specific finding on that would preclude the court from determining that there's substantial evidence to support it. Can I say this? I think my takeaway from Mr. Wright's presentation, and you'll have a chance to correct me, is something like this. When you read the specification, overwhelmingly it indicates that what this patent is about is a process of forming an intermediate product in which there are multiple chips. And at the end of the day, you cut them into individualized pieces. But the intermediate stage has always more than one chip in this resin. And the cutting into individualized ones is the last stage. And there's nothing in the spec about the problem being identified for solution about an intermediate product that is individualized. I think he has conceived there is language, summary of the invention, which is a problem for him. But in one way or another, if you think about what the patent as a whole is about, it's about this intermediate stage of multiple chips. Can you address that? Absolutely. I would take issue with that characterization of what the patent is about. There's actually two different aspects to the patent. One is the subject matter of Claim 1. And the point of novelty there is clearly the use of two cutting steps to cut the lead frame. I will also note that Claim 1 doesn't actually say that the step requires separating a product or creating an individual product. All it says is cutting the lead frame. And in terms of the role that intermediate product plays in this method claim, it's really environment, it's the work piece upon which the method acts. Everything in the record, every piece of testimony from both experts is consistent. The method is agnostic as to whether or not you're cutting one product or multiple products, whether there's more than one product in the lead frame. It's all about the benefits of making the two cuts in the lead frame, which are described as reducing the problem of burrs that can impact surface matter. It also has nothing to do with efficiency, and that's where there's some confusion because the second aspect of the patent, which really is not an issue on this appeal, is how you make the lead frame itself. And that's where the patent is clear in terms of talking about the purported benefits and efficiency and cost reduction by eliminating a chemical etching step as part of the method of making the lead frame using solely mechanical means to do the metal forming of the lead frame itself. That's what the patent points to if you look at the disclosure as resulting in improved efficiency. There's no dispute that manufacturing lead frames in these array or batches was well known. I mean, that's been commercially known forever. The patent acknowledges that. So claiming that certainly was not anything new. That's not the source of any additional efficiencies to be gained. That's all associated with how the lead frame is made, which is not at all the subject of claim one. And the fact that manufacturing lead frame products in bulk or mass producing using a multi-chip intermediate product was well known and commercially performed for many years, that's not a reason to sort of read that into the claim and somehow incorporate commercial practicalities into the claim method. The method has application regardless of whether you're using it for commercial production. And I think that is clearly reflected in the intentional language that was chosen not to limit intermediate product to multiple chips. But again, even if the court were to do that, I do just want to highlight there was a question asked about figure 14 and the example chips that show the lead frame protruding from the sides of the packaging material. That is not anything that's described as the result of the cutting process. As Mr. Wright indicated, I just want to clear that up. The only way that the patent teaches that that particular type of product can be formed is in the example where what's done is what's called individually molding of multiple packages on the lead frame. So there's two ways to do it. This is described in column six starting at line 27. You either have a single mold cavity where everything goes in to the same cavity and when you put the mold in, you get one big blob layer. That's what's shown in figure 16. Or very clearly the patent describes, there's no dispute about this, individual molding cavities. Basically a little cover for each chip so that the result is not this continuous layer but separate, even in a multi-chip embodiment, individual what's called mold caps on each of the separate chips. Like a muffin pan. Muffin pan. Exactly. That's a good analogy. The patent clearly says both of those are intermediate products, which necessarily means both of those have packaging layers. So the patent itself teaches very clearly that packaging layer is not, even in the context of a multi-chip intermediate product, packaging layer need not be between chips. It need not be continuous. It's still a packaging layer even if it's a muffin pan. And that's all. Just to be clear, page 23 of the final written decision, which Mr. Wright asserts was the board improperly relying on this mock-up of figure 16, I disagree that the board relied on that, but in any event I wouldn't acknowledge that it was in any way improper because all that figure did was provide a visual aid for what is described the muffin pan version of the intermediate product. And all it did was show that when you take a cross-section of that, of course you're going to see gaps in the layer between the chips. There's no dispute about that. And both experts acknowledge that that is the version that will result in the end product showing the figure 14 because you're not having to cut through the resin. You're only having to cut through the leach ring. Do you have anything else? If not, I think we have your motion. Thank you. And we would urge the court to affirm the board's decision. Thank you. Mr. Wright. Thank you, Your Honor. I'll be brief. A couple of points that I think are just not correct in what you just heard. First off, this idea that there is a figure 16 prime intermediate product that has spaces between the chips is contrary to what the patent says. The patent specifically says, this is column 8, line 6, the thus obtained intermediate product generally gives a sectional view as shown in figure 16. In this figure, reference number 5 prime refers to the resin layer formed in the package forming operation. If you go back to column 6, this is where the actual discussion of the molding occurs, column 6 starting at about line 28. It says in the resin packaging step, subsequent to the lead frame cutting step, you have either a single molding cavity or multiple molding cavities. You put in the thermosetting resin, and you'll see down at the bottom you get a molded intermediate product. It doesn't say you get a different molded intermediate product than figure 16 in column 8. It says that you get a cross-sectional view of figure 16 regardless of which type of molding. It may be a muffin tin, but if you fill each one of those muffin tins too much, you're going to have muffin on top of those individually molded parts, and you're still going to have a continuous layer of resin regardless of the type of molding. The patent tells us that. Another point is Mr. Rizzi says that you're looking at the summary of the invention. In the summary of the invention, the only difference over the prior art is the two-step cutting process. That's not true. It's the two-step cutting process and the use of the multi-chip lead frame in the intermediate product of figure 16. The key to that is if you look at claim 1, it doesn't talk about just putting a chip on a lead frame. It talks specifically about forming a packaging layer, and it specifically talks about cutting the intermediate product, not just the lead frame. So two key differences in the claim are not in the summary of the invention. What do we make of that? Those terms have meaning. Why does intermediate product have to be cut rather than just the lead frame? The reason is because the intermediate product matters. Why do you have to have a layer of the packaging resin put on top? Why don't you just say package as it does in the summary of the invention? The reason is because the packaging layer is defined in figure 16 as continuous, and that's 5.1. So it's very important because it's not just cutting a lead frame to separate a single chip from a single, excuse me, cutting a lead frame to separate just a single chip from the lead frame, as Mr. Rizzi said. Everything in the patent points to multi-chip technology, multi-chip processing, and creating this figure 16 intermediate product, which is distinguishable over anything in the prior art. That's the key to the invention, and for whatever reason this notion of a single-chip process is just not, it's clearly erroneous. It's not supported factually in the specification, and figure 16 prime is contrary to what the patent teaches. That cannot be correct. It can't be substantial evidence of on which the board's final written decision can rest. Thank you. Thank you, Mr. Wright. Thanks to both counsel. The case is submitted.